# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

MARLA A. MANCHESTER                                    CIVIL ACTION

VERSUS

STATE OF LOUISIANA, THROUGH THE                   NO. 23-00034-BAJ-EWD
DEPARTMENT OF CHILDREN AND
FAMILY SERVICES

## RULING AND ORDER

This is a failure-to-promote case. Plaintiff, after endeavoring without success to obtain a promotion within Defendant Department of Child and Family Services ("DCFS") has filed suit alleging that such promotions were denied on account of her sexual orientation. (Doc. 1). Now before the Court is Defendant's **Motion For Summary Judgment (Doc. 25, the "Motion")**. Plaintiff opposes the Motion. Because Plaintiff fails to establish a *prima facie* discrimination claim, the Motion will be granted, and the above-captioned matter will be dismissed.

## I.    SUMMARY JUDGMENT EVIDENCE

The facts set forth below are drawn from Defendant's Statement Of Material Facts (Doc. 25-9, "Defendant SOF") and Plaintiff's Responses (Doc. 49-16, "Plaintiff SOF").

Plaintiff has worked for DCFS since August 2006. (Defendant SOF ¶ 15). Prior to joining DCFS, Plaintiff earned bachelor's and master's degrees in social work, along with a master's degree in criminal justice. (*Id*. ¶¶ 16-18). Plaintiff joined DCFS as a Child Welfare Specialist, and was promoted to Child Welfare

Supervisor in March 2013. (*Id.* ¶¶ 19-21). In October 2015, Plaintiff was staffed as a Child Welfare Manager in Baton Rouge, Louisiana. (*Id.* ¶ 22). She returned to her Child Welfare Supervisor position in February 2017. (*Id.* ¶ 23). Plaintiff was then selected as a Project Coordinator for the Comprehensive Child Welfare Information Systems ("CCWIS") project in July 2017. (*Id.* ¶ 24). Plaintiff's duties with the CCWIS project involved technical tasks with the various computer programs used by Child Welfare employees. (*Id.* ¶ 69).

Also in 2017, Plaintiff filed a grievance and EEOC Charge against DCFS, (*id.* ¶ 147), generally alleging that she was denied promotion on account of her manner of dress and appearance, (*see* Doc. 49-4). In her grievance, Plaintiff identified DCFS personnel Linda Carter, Mona Michelli, Anthony Ellis, Rhenda Hodnett, and Karla Venkataraman. (Defendant SOF ¶ 148).

In January 2022, Plaintiff's career began to hit a series of snags. DCFS posted a vacancy (hereinafter, "Job 1") for a Child Welfare Consultant position in the On-the-Job Training ("OTJT") program. (*Id.* ¶ 30). Plaintiff applied. (*Id.* ¶ 34). The Child Welfare Manager overseeing the OTJT program was Ellen Hammons, who in turn reported to Leslie Calloway. (*Id.* ¶ 31). Calloway had final authority over who was selected for the Child Welfare Consultant position, but she delegated the selection process to Hammons. (*Id.* ¶ 32). Hammons responded to Plaintiff and other applicants on February 4, 2022, and requested that each provide their last two performance evaluations and written responses to two interview questions by February 7, 2022. (*Id.* ¶ 35). Plaintiff did not respond until February 15, 2022, at

which time a candidate had already been selected. (*Id.* ¶¶ 36-40).

Not to be discouraged, on February 15, 2022, Plaintiff applied to another vacancy (hereinafter, "Job 2") for a Child Welfare Consultant position. (*Id.* ¶ 42). Hammons was again the manager for this program and conducted the hiring process. (*Id.* ¶ 43). On February 23, 2022, Hammons requested that Plaintiff and other applicants prove their last two performance evaluations and written responses to two interview questions. (*Id.* ¶ 45). Plaintiff provided Hammons with these materials that same day. (*Id.* ¶ 46). Hammons then selected two persons to interview for the position, Plaintiff and Melinda Miller. (*Id.* ¶ 47). Hammons selected the interview panel, which consisted of herself, Renee Spell, and Robbie Montgomery. (*Id.* ¶ 51). Each member of the panel was selected for their experience in and knowledge of the DCFS. (*Id.* ¶¶ 52-53). Miller and Plaintiff were given the same questions in the interview, which had been previously decided upon by Hammons. (*Id.* ¶¶ 50, 54). Each member of the interview panel independently scored the applicants oral and written answers. (*Id.* ¶¶ 55-56).[1]

Plaintiff received a total interview score of 83. (*Id.* ¶ 58). Miller received a total interview score of 98. (*Id.* ¶ 59). Job 2 went to Miller. (*Id.* ¶ 61). Plaintiff contends that these scores did not accurately reflect the abilities of both applicants, but does not dispute that those were the scores given. (Plaintiff SOF ¶¶ 55, 58-59).

No member of the interview panel scored Plaintiff higher than Miller.

---

[1] Plaintiff "denies that the scoring process ensured that there was no significant disparity in scoring," (Plaintiff SOF ¶ 55), but does not deny that the interview panel independently scored the interviews.

(Defendant SOF ¶¶ 58-59). Miller was in the process of receiving a master's degree in social work at the time of the interview, and received this master's degree in May 2022. (*Id.* ¶ 77). The panel gave weight to Miller's recent supervisory experience with DCFS's "three main Child Welfare programs" (Child Protective Services (hereinafter, "CPS"), Family Services, and Foster Care). (*Id.* ¶¶ 66-67). In contrast, Plaintiff's supervisory experience was limited to only the CPS and Family Services programs, and had concluded four years prior to her interview. (*Id.* ¶¶ 66-68). Plaintiff accedes that the panel relied on these factors in making its recommendation, but contends that this reliance was unfair in light of Plaintiff's other qualifications. (Plaintiff SOF ¶¶ 66-68). The panel also believed that Plaintiff lacked recent "field experience," given her role with the CCWIS project. (Defendant SOF ¶ 71). Plaintiff again does not contend that the panel relied on this fact. (*See* Plaintiff SOF ¶ 71).

No member of the panel was aware of the sexual orientations of Plaintiff or Miller. (Defendant SOF ¶ 79). Plaintiff acknowledges that the panel was unaware of Plaintiff's sexual orientation, but argues that a lack of awareness of Plaintiff's sexual orientation does not "preclude the possibility that biases could still exist in their evaluations and decisions regarding her physical appearance." (Plaintiff SOF ¶ 79). No questions were asked about Plaintiff or Miller's sexual orientation during the interview process. (Defendant SOF ¶ 78). Defendant also notes that one member of the interview panel, Spell, was part of other interview panels that selected Plaintiff for promotion. (*Id.* ¶ 81).

One month later, Plaintiff applied for another Child Welfare Consultant vacancy (hereinafter, "Job 3") within the OTJT program. (*Id.* ¶ 87). Hammons was in charge of the hiring process for this position, but collaborated with Miki Egan throughout. (*Id.* at 16). Plaintiff was selected to interview for Job 3, along with Raefira Picket, Morning Ward, Bobby Bernard, and Tabitha Guillory. (*Id.* ¶ 92). Hammons and Egan selected the interview questions and served on the interview panel, along with LaTrese LaCour. (*Id.* ¶ 95). Plaintiff was interviewed and scored by the panelists, receiving a total interview score of 96. (*Id.* ¶ 100). Bernard received a total interview score of 119. (*Id.* ¶ 104). Bernard was selected. (*Id.* ¶ 101). As in the case of Job 2, Bernard possessed experience with CPS, Family Services, and the Foster Care programs, and the panel believed he had more recent field experience working in the Child Welfare programs. (*Id.* ¶¶ 111-112). Plaintiff does not contest that the panel relied on these factors. (Plaintiff SOF ¶¶ 111-112).

Hammons and Egan did not know the sexual orientation of Plaintiff or Bernard during the interview process for Job 3. (Defendant SOF ¶ 117). To contest this fact, Plaintiff was required to cite to evidence specifically controverting Hammons and Egan's lack of knowledge. Instead, Plaintiff responds that because Plaintiff preferred "masculine dress," "it cannot be definitively stated that Hammons and Egan were unaware of her sexual orientation at the time of the interviews." (Plaintiff SOF ¶ 117). Putting aside that this suggested typecasting is an inherently fraught and frowned-on endeavor, Plaintiff has offered no competent summary judgment evidence to dispute Hammons and Egan's lack of knowledge.

(*See id.*). Plaintiff vaguely gestures towards her own declaration and the depositions of Shannon Matthews and Renita Smith in support, but none of these sources address Hammons and Egan's knowledge of Plaintiff's sexuality. (*See* Docs. 49-12, 49-13, 49-15). The Local Rules governing summary judgment practice required Plaintiff to cite specific evidence controverting Defendant's proposed facts, or risk those facts being deemed admitted for present purposes. *See* M.D. La. LR 56(c), 56(f). Here, Plaintiff's speculative and unsubstantiated reply is obviously not sufficient to carry her summary judgment burden. Accordingly, under Local Rules 56(c) and 56(f), the Court deems admitted the fact of Hammons and Egan's lack of knowledge of Plaintiff's sexuality, due to Plaintiff's failure to properly controvert it. *See N. Frac Proppants, LLC v. Regions Bank, NA*, No. 19-cv-00811, 2022 WL 1297180, at *1 n.1 (M.D. La. Apr. 29, 2022) (defendant's proposed facts deemed admitted as written due to plaintiffs' failure to properly support their "qualified" admissions); *see Jones v. United States*, 936 F.3d 318, 321 (5th Cir. 2019) (non-movants will not avoid summary judgment by presenting "speculation, improbable inference, or unsubstantiated assertions").

There were no questions or comments to Bernard or Plaintiff during the interview process for Job 3 about their respective sexual orientation. (Defendant SOF ¶ 116). After Bernard was selected for Job 3, Egan and Hammons offered Plaintiff an open OTJT Child Welfare Consultant position in New Orleans. (*Id.* ¶

119).[2] Plaintiff declined. (*Id.* ¶ 120).

On June 8, 2022, Plaintiff applied for another Child Welfare Consultant position (hereinafter, "Job 4") in the CPS Centralized Decision-Making ("CCDM") Unit. (*Id.* ¶ 124). Denise Evans supervised the hiring process for Job 4. (*Id.* ¶ 125). There were twenty-eight applicants for the position. (*Id.* ¶ 132). Evans stated that in selecting applicants for interviews, her methodology involved giving the most weight to CPS supervisory experience. (*Id.* ¶ 133). Evans did not believe Plaintiff had the CPS supervisory experience necessary for the position. (*Id.* ¶ 135). Plaintiff was not selected for an interview. (*Id.*). Plaintiff does not deny that Evans had these opinions and methodology, but argues that Evans's method and opinion were erroneous. (Plaintiff SOF ¶¶ 133, 135). Those who were eventually hired for Job 4 each held more recent and extensive CPS supervisory experience than Plaintiff at the time she applied. (Defendant SOF ¶¶ 136-140). Plaintiff does not contest that those hired had more CPS supervisory experience. (Plaintiff SOF ¶ 137).

---

[2] Plaintiff testified that Egan told her when offering the New Orleans position that an unnamed "they" "wouldn't allow [her] to work in Baton Rouge, Lafayette or Lake Charles." (Doc. 25-3 at p. 36). The Court will not consider this statement as competent summary judgment evidence, as it is at least hearsay, and potentially hearsay within hearsay. Plaintiff is testifying to an out-of-court statement by Egan, which is directly contradicted by Egan's sworn statement, (Doc. 25-7 at p. 4), and so this statement must qualify under a hearsay exception. Plaintiff bears the burden of showing which exception this statement qualifies under, *see Galeana v. Encompass Indem. Co.*, No. CV SA-21-CA-460-FB, 2022 WL 1518944, at *8 (W.D. Tex. Mar. 21, 2022) (collecting cases), and Plaintiff has not done so. To the contrary, Plaintiff appears to concede the point. (*See* Plaintiff SOF ¶ 121 ("***This is more than just hearsay***, as it reflects a pattern. . . ")). Further, even if Egan's statement fell under an acceptable hearsay exception, this still does nothing to cure the main out-of-court statement uttered by the unknown "they," allegedly imparted to Egan, that Plaintiff would not be allowed to work in the Baton Rouge region. The Court notes that at all relevant times since she joined Defendant in 2006, and excepting those temporary multi-month assignments in New Orleans, (*id.* ¶ 112), Plaintiff has formally worked in the Baton Rouge region.

Evans testified that she was not aware of Plaintiff's sexual orientation, or the sexual orientation of those eventually hired for Job 4. (Defendant SOF ¶ 145). Plaintiff denies this asserted fact on the same grounds as those given for Hammons and Egan. (Plaintiff SOF ¶ 145). Because, as above, Plaintiff offers nothing save unsubstantiated speculation as to Evans's knowledge of Plaintiff's sexuality, the Court deems this fact admitted. *See N. Frac Proppants, LLC*, 2022 WL 1297180, at *1 n.1; *see Jones*, 936 F.3d at 321.

None of the persons named in Plaintiff's 2017 grievance spoke with the decision makers for Jobs 1-4, those being Hammons, Egan, Calloway, and Evans. (Defendant SOF ¶ 150). Plaintiff contests this fact, and offers that those persons named in Plaintiff's 2017 grievance "may have shaped the perspectives of the actual decision-makers, even if there was no direct consultation." (Plaintiff SOF ¶ 150). This is, again, pure speculation, and the Court deems it admitted that no hiring authorities from Plaintiff's 2022 job hunt spoke with any of the persons named in Plaintiff's prior grievance against Defendant.

In June 2022, Plaintiff was hired as a Program Consultant in the Workforce Development program. (Defendant SOF ¶ 25).

On July 8, 2022, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging that she was denied four promotions to the Child Welfare Consultant position on account of her sexual orientation. (Plaintiff SOF ¶ 28). She was granted the right to sue on October 25, 2022. (*Id.*).

Several months later, in January 2023, Plaintiff applied for and was promoted to a Child Welfare Manager position in Baton Rouge. (Defendant SOF ¶ 86). In June 2023, Plaintiff was again promoted to serve as a Baton Rouge Area Director. (*Id.* ¶ 27).

Plaintiff filed the present suit on January 20, 2023, alleging that she was denied promotions on account of her sexuality. (*Id.* ¶ 157).[3] Plaintiff has since testified that none of the persons involved in the hiring processes for Jobs 1-4 have made negative comments about her sexual orientation, and that she has no reason to believe that the interview scores she received for Jobs 2 and 3 were based on her sexual orientation. (Doc. 25-3 at pp. 28-30, 34-36). Plaintiff has also testified that she did not know the identities of the individuals selected for Jobs 2 and 4 before the time of her deposition. (*Id.* at pp. 31, 40).

On July 15, 2024, Defendant filed the Motion for Summary Judgment that is presently before the Court, chiefly arguing Plaintiff has failed to make a *prima facie* case for failure to promote. (Doc. 32). Plaintiff has opposed Defendant's Motion. (Doc. 49).

## II.   ANALYSIS

### A. Rule 56 Standard

Federal Rule of Civil Procedure ("Rule") 56(a) provides that the Court may

---

[3] Plaintiff contests that her Complaint also brought claims for retaliation and general discrimination. (Plaintiff SOF ¶ 29). Plaintiff is wrong, (*see* Doc. 1), and may not amend her Complaint through an opposition to a motion for summary judgment. *See Thibodeaux v. DISA Glob. Sols., Inc.*, No. CV 18-651-SDD-RLB, 2020 WL 6479540, at *6, fn. 75 (M.D. La. Nov. 3, 2020).

grant summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the movant bears its burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* at 587. Stated differently, "[i]f the party with the burden of proof cannot produce any summary judgment evidence on an essential element of [her] claim, summary judgment is required." *Geiserman v. MacDonald*, 893 F.2d 787, 793 (5th Cir. 1990). Further, "on a motion for summary judgment, the evidence proffered by the plaintiff to satisfy his burden of proof must be competent and admissible at trial." *Bellard v. Gautreaux*, 675 F.3d 454, 460 (5th Cir. 2012). "[U]nsubstantiated assertions are not competent summary judgment evidence." *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). Hearsay statements are generally inadmissible for summary judgment purposes. *See Okoye v. Univ. of Texas Houston Health Sci. Ctr.*, 245 F.3d 507, 510 (5th Cir. 2001) ("Because these statements are hearsay, they are not competent summary judgment evidence.").

### B. Title VII Statement of Law

"Title VII failure-to-promote claims are evaluated under the *McDonnell Douglas* burden-shifting framework." *Hart v. Mississippi Dep't of Rehab. Servs.*, No.

22-60408, 2023 WL 3888175, at *1 (5th Cir. June 8, 2023) (citing *Davis v. Dall. Area Rapid Transit*, 383 F.3d 309, 316–17 (5th Cir. 2004)). This framework requires a plaintiff to first demonstrate a *prima facie* case by providing evidence that: "(1) she is a member of a protected class; (2) she sought and was qualified for a position for which applicants were being sought; (3) she was rejected for the position; [and] (4) the employer hired a person outside of the plaintiff's protected class or continued to seek applicants with the plaintiff's qualifications." *McMullin v. Mississippi Dep't of Pub. Safety*, 782 F.3d 251, 258 (5th Cir. 2015). The U.S. Court of Appeals for the Fifth Circuit has recognized that this fourth element may also be satisfied when a plaintiff shows that she was not promoted because of her membership in a protected class. *See Vann v. City of Meridian*, No. 3:21-CV-305-DPJ-ASH, 2024 WL 4008214, at *4 (S.D. Miss. Aug. 30, 2024) (citing *Autry v. Fort Bend Indep. Sch. Dist.*, 704 F.3d 344, 347 (5th Cir. 2013)); *see also Fuhr v. City of Sherman, Texas*, No. 23-40116, 2023 WL 6518159, at *2 (5th Cir. Oct. 5, 2023). If Plaintiff successfully establishes a *prima facie* case, the burden shifts to Defendant to provide a legitimate, non-discriminatory reason for failing to promote her. *See Fuhr*, 2023 WL 6518159, at *2. Should Defendant do so, the burden rebounds back to Plaintiff, who must then prove by a preponderance of the evidence that the proffered reason is pretextual. *See id*.

### C. Discussion

For present purposes, Defendant does not dispute that Plaintiff has satisfied the first three elements of her *prima facie* failure-to-promote case. (*See* Doc. 32 at p.

4). It is with the fourth element of Title VII failure-to-promote claims, that "the employer hired a person outside of the plaintiff's protected class or continued to seek applicants with the plaintiff's qualifications," *McMullin*, 782 F.3d at 258, or that Plaintiff was otherwise denied the promotion because of her sexual orientation, that Defendant takes issue. (*Id.*).

Plaintiff has provided no competent summary judgment evidence that any of the persons selected for Jobs 1-4 are not members of her protected class. To the contrary, Plaintiff has testified that she is unaware of the sexual orientations of the recipients of Jobs 2 and 3, (Doc. 25-3 at p. 59), that she did not know who received Job 4, (*id.* at p. 40), and has provided no testimony or other evidence pertaining to the sexual orientation of the Job 1 recipient other than unsupported allegations in her Complaint and Opposition that heterosexual and cisgender employees were promoted over her. (Docs. 1 at p. 2, 49 at p. 3). Unsubstantiated allegations are not competent summary judgment evidence. *Jones*, 936 F.3d at 321.

Plaintiff must therefore provide some showing that she was not promoted because of her sexual orientation. *See Vann*, 2024 WL 4008214, at *4. To begin, it does not speak well of Plaintiff's case that it is admitted that the members of the hiring panels for Jobs 1-4 did not know Plaintiff's sexuality. (Defendant SOF ¶¶ 79, 117, 145). It is similarly damaging that Plaintiff herself testified that she has no reason to believe that her interview scores were based on her sexual orientation. (Doc. 25-3 at pp. 28-30, 34-36). To overcome these facts, Plaintiff relies on allegations related to prior run-ins with Defendant's allegedly discriminatory

practices, and generally paints a broad picture of Defendant as a systemically discriminatory organization. An analysis of these arguments in the context of Jobs 1-4 is provided below. The Court concludes therein that Plaintiff has failed to raise any genuine dispute as to the fourth element of her *prima facie* case, and therefore concludes that dismissal is warranted.

### i. Job 1

Plaintiff concedes that it was not on account of her sexual orientation that she did not receive Job 1, but rather that she did not complete the job application process prior to another candidate being selected. (Plaintiff SOF ¶ 41; Doc. 49 at p. 13). Plaintiff's claims relating to Job 1 are therefore subject to dismissal.

### ii. Job 2

Regarding Job 2, Plaintiff contends that the scored interviews were marred by "notable inconsistencies" in the grades assigned which, in her view, "indicate[s] bias and subjectivity in the evaluation process." (Plaintiff SOF ¶ 55). As support for this assertion, Plaintiff cites her own declaration, where she avers that she has generally experienced biases and hurtful comments in the course of her employment. (Doc. 49-15 at pp. 4, 8). She also cites to the depositions of her coworkers Renita Smith and Shannon Matthews to generally buttress Plaintiff's accusation of diffuse discriminatory animus harbored by Defendant's employees and leadership. (*See, e.g.,* Plaintiff SOF ¶ 55). In these depositions, Smith opines that while she has "no proof," she does believe that Plaintiff has been subjected to unwanted comments on account of her sexual orientation. (Doc. 49-13 at p. 20). For her part, Matthews says that it is always "implied" that Plaintiff is gay or "boyish,"

and that these traits prevent or make it harder for her to receive or be recommended for promotions. (Doc. 49-14 at p. 8). According to Matthews, she has received more pushback on those times when she has recommended Plaintiff compared to her other recommendations. (*Id.* at pp. 7-8).

For similar reasons, Plaintiff takes issue with the hiring panel for Job 2 concluding that Miller was more qualified for the position on account of the breadth and recency of her relevant experience. (Plaintiff SOF ¶¶ 65-68). As support for her assertion that the panel was implicitly biased, Plaintiff provides testimony from Smith stating that she felt questioned by Mona Michelli when she recommended Plaintiff for her current position with Defendant. (Doc. 49-14 at pp. 5-6).[4] Plaintiff also cites to her service record with Defendant, her belief that the interview scores did not accurately reflect her abilities, and her belief that her "promotional experiences have been impacted by perceived biases." (Doc. 49-15 at pp. 2-3, 8-9).

As a final argument for the presence of biases and hidden prejudice in the hiring panel, Plaintiff cites to those alleged statements underlying her 2017 grievance. (Doc. 49 at pp. 20, 22).

Plaintiff fails to carry her burden with the above. The "evidence" underlying Plaintiff's conclusions is essentially speculative. Plaintiff argues that although the members of the hiring panel for Job 2 were unaware of Plaintiff's sexual

---

[4] Plaintiff also contends that Smith testified that another supervisor, Ms. Guinta, stated that Plaintiff was "too boyish for a management position." (Doc. 49 at p. 25). This badly misstates Smith's testimony. Smith averred that it was she, not Guinta, who stated that she was worried that unnamed others would possess the "too boyish" concern regarding Plaintiff's promotion. (Doc. 49-14 at p. 7). Guinta responded by advising that Smith recommend Plaintiff for promotion. (*Id.*).

orientation, (Defendant SOF ¶ 79), although these members made no comments as to Plaintiff's sexuality, (*id.* ¶ 78), and although Plaintiff, by her own admission, has no reason to believe the interview scores she received from the panel were in any way based on her sexual orientation, (Doc. 25-3 at pp. 29-30), that the panel was unknowingly pressured by both their inherent, latent biases and the views of individuals with whom key members of the panel did not speak, (Defendant SOF ¶ 150). The problem with this assertion is that argument is not evidence, and evidence is what Plaintiff is required to provide to the Court at this stage.

Plaintiff has no *evidence* that any of the members of the hiring panel for Job 2 were prejudiced against her on account of her sexual orientation. Bare, unsupported allegations do not suffice. Smith's opinion, with "no proof" in support thereof, (Doc. 49-13 at p. 20), does not move the needle. Matthew's testimony that unidentified persons "imply" as to Plaintiff's sexual orientation, (Doc. 49-14 at p. 8), similarly casts no light on whether the identified members of the hiring panel were prejudiced or biased.

To this point, there is no testimony or evidence setting forth the sexual orientation of the person who received Job 2. Such testimony, assuming the person selected did not share Plaintiff's sexual orientation, could possibly allow the Court to draw an inference that members of the panel were prejudiced, assuming other factual circumstances supported such an inference. *See Wittmer v. Phillips 66 Co.*, 915 F.3d 328, 332 (5th Cir. 2019) (stating that evidence of a comparator was essential to plaintiff's Title VII discrimination claim); *see Copeland v. Georgia Dep't*

15

*of Corr.*, 97 F.4th 766, 781 (11th Cir. 2024) (same). But there is no such testimony. Similarly, evidence that members of the hiring panel conversed with and were influenced by those persons named in Plaintiff's 2017 grievance could potentially allow the Court to begin to make the inference that the panel was biased against Plaintiff. Even if this did occur, the merits of Plaintiff's claims would still be dubious. *Cf. Montgomery-Smith v. George*, 810 F. App'x 252, 261 (5th Cir. 2020) (statements made to plaintiff years before she was denied promotion did not create fact issue supporting her Title VII claims). But there is no such evidence here. To the contrary, the decision makers for Jobs 1-4 each testified that they did not speak with any of the persons named in Plaintiff's 2017 grievance. (Defendant SOF ¶ 150).

There is therefore no basis for the Court to conclude that the interview questions, which were the same for all applicants, (*id.* ¶ 54), and the corresponding scores were intended to harm Plaintiff's candidacy. There is likewise no basis for the Court to conclude that the interview scores were harmed by "notable inconsistencies," (Plaintiff SOF ¶ 55), or that the subjective nature of the interview process is somehow problematic. Interviews are subjective by nature, but, as discussed above, there is no evidence that this subjectivity was weaponized against Plaintiff by any single member of the panel. To the contrary, the members of the panel unanimously scored Plaintiff's performance beneath Miller's. (Defendant SOF ¶¶ 58-59). As to the purported inconsistencies, the only inconsistency that Plaintiff highlights is her own comparatively lower score. (Plaintiff SOF ¶ 55). There is no evidence that Plaintiff did not score lower than the Job 2 recipient because of

anything other than her own performance. Candidates' performance in interviews are properly considered by employers in determining who to hire. *See, e.g., Montgomery-Smith*, 810 F. App'x at 262; *Bardell*, 2024 WL 3408621, at *4. Interview scores were considered by the decision-maker for Job 2 in deciding who to hire, (Defendant SOF ¶ 55), and this consideration does not support Plaintiff's contention that she did not receive Job 2 because of her sexual orientation.

Nor can Plaintiff point to a disparity in credentials or experience as circumstantial evidence of a flawed hiring process for Job 2. Miller was in the process of receiving a master's degree in social work at the time of her application (which she received months later), and had supervisory experience in the CPS, Family Services, and Foster Care programs. (Defendant SOF ¶¶ 67, 77). At the time of her interview, Miller was a supervisor in the CPS and Family Services program. (*Id.* ¶ 67). A year before, Miller was a supervisor in the Foster Care program. (*Id.*). Plaintiff only possessed supervisory experience with the CPS and Family Services programs, and this experience was in 2017. (*Id.* ¶ 68). The panel believed Miller's more recent supervisory experience with all three main Child Welfare programs made her a stronger candidate on paper. (*Id.* ¶ 66). Plaintiff might take issue with the panel's conclusion, but she does not dispute that Miller had more recent supervisory experience. (Plaintiff SOF ¶ 67). The recency and similarity of one's professional experience to the sought-after job is a factor that employers can and do consider when hiring. *See Bardell v. Jefferson Par. Sch. Bd.*, No. 23-30223, 2024 WL 3408621, at *3 (5th Cir. July 15, 2024) (affirming district court grant of summary

judgment when the employer did not promote plaintiff because of concerns regarding the plaintiff's work experience).

Further, while credential comparisons are generally conducted at the pretext stage of a Title VII analysis, *see, e.g., Toval v. Children's Hosp.*, 614 F. App'x 170, 173 (5th Cir. 2015), the Court will briefly address Plaintiff's arguments concerning her credentials vis-à-vis Miller's. Plaintiff has failed to show that she was "clearly" more qualified than Miller by her possession of a master's degree in social work at the time of application, as is required for this issue to play a factor in a Title VII failure-to-promote analysis. *See Montgomery-Smith*, 810 F. App'x at 263. Having received greater formal education did not necessarily make Plaintiff a "clearly better qualified" candidate for Job 2, especially in light of her comparatively weaker interview performance and work experience. *See Toval*, 614 F. App'x at 173 ("While [plaintiff] does have more formal [] education," the hired candidate had "more managerial education and experience" such that plaintiff was not "clearly better qualified.").[5]

Because Plaintiff has failed to provide any evidence to establish her *prima facie* case that she was not promoted to Job 2 because of her sexual orientation, Plaintiff's claims as to this job are subject to dismissal.

### iii. Job 3

---

[5] Moreover, even if Plaintiff did possess qualifications well beyond those of Miller, it is still unclear whether Plaintiff could survive summary judgment. Because Plaintiff offered no evidence as to Miller's sexual orientation, the hypothetical disparity in qualifications would not necessarily support the proposition that Plaintiff was not promoted *because of* her sexual orientation, since Miller could share that very same orientation.

Plaintiff presents substantially identical arguments for her claims as relating to the Job 3 hiring process. For the same reasons provided above, her assertions as to the latent biases in the hiring panel and the presence of secret institutional pressure against her are unavailing. Plaintiff's allegations surrounding the *possible* inconsistencies in the interview questions and process, (Plaintiff SOF ¶¶ 98, 103-104), are similarly unpersuasive, and do not constitute the kind of evidence Plaintiff needs to put forth at this stage. The interview questions were the same, and Plaintiff does not explain what she means by "inconsistencies" in the interview scoring other than that she received a lower score than Bernard. (*See id.*). As in Job 2, the hiring panel unanimously scored Plaintiff beneath Bernard. (Defendant SOF ¶¶ 103-104).

Also similar to the process for Job 2, the hiring panel believed Bernard possessed more relevant prior experience with the CPS, Family Services, and Foster Care programs. (*Id.* ¶ 111). Plaintiff does not deny that Bernard's experience gave him an advantage, but contends that her lesser experience was through no fault of her own, and was instead part of a larger scheme to deny her training. (Plaintiff SOF ¶ 111).

There is some dispute surrounding the recency of Plaintiff's field experience, with the hiring committee apparently under the impression that Plaintiff's most recent field experience occurred in 2017, while Plaintiff averred to having performed field work from November 2021 to January 2022. (Plaintiff SOF ¶ 112). Bernard's more recent field experience was cited as a factor in the hiring panel

choosing Bernard for the job. (Defendant SOF ¶ 112). Even if Plaintiff is correct in her account of her field experience, it is not clear that the panel's belief as to the greater recency of Bernard's field experience would be erroneous, as both Bernard and Plaintiff applied for Job 3 in March 2022, after Plaintiff's time doing field work had ended. (Defendant SOF ¶ 87; Plaintiff SOF ¶ 112). It is also unclear how, absent knowledge of Plaintiff's sexual orientation, (Defendant SOF ¶ 117), a panel's mistake about Plaintiff's field experience could be used to prove that Plaintiff did not receive the job because of said orientation.

Plaintiff did hold an edge over Bernard in one area, in that she possessed a master's degree in social work and he apparently did not. (Doc. 25-3 at p. 36). A master's degree in social work was listed as a strong preference for applicants to the Job 3 position. (Doc. 32 at p. 34).

Again, qualification examinations are generally conducted at the pretext stage of a Title VII failure-to-promote analysis, and even if Plaintiff were "clearly better qualified," *Toval*, 614 F. App'x at 173, it is still unlikely that she would have established her *prima facie* Title VII failure-to-promote claim, given the absence of any sort of evidence delineating Bernard's sexual orientation or the prejudices of the hiring panel.

Nevertheless, the Court quickly notes that, as in Job 2, the formal education gap between Plaintiff and Bernard is not so great as to necessarily countervail the advantages Bernard possessed on account of his superior interview performance and work experience such that Plaintiff was the "clearly better qualified" candidate.

20

*See Toval*, 614 F. App'x at 173; *see also Thomas v. Trico Prod. Corp.*, 256 F. App'x 658, 662 (5th Cir. 2007) ("better education. . . do[es] not establish that [an applicant] is clearly better qualified" (quoting *Price v. Fed. Express Corp.*, 283 F.3d 715, 723 (5th Cir. 2002)); *see also Deines v. Tex. Dep't of Protective and Regulatory Servs.*, 164 F.3d 277, 282 (5th Cir. 1999) (an "employer's judgment as to qualifications" is not evidence of a discriminatory motive unless "no reasonable employer would have made the same decision").

The Court has simply been provided with no basis to make the inferential leap that Plaintiff was denied Job 3 on account of her sexual orientation. Because of this, her claims as relating to this job are subject to dismissal.

### iv.   Job 4

The same infirmities found above are present in Plaintiff's claims for Job 4. Defendant has put forth evidence that the decision-maker for Job 4 was not aware of Plaintiff's sexual orientation, (Defendant SOF ¶ 145), and that the decision-maker had no communications with those persons named in Plaintiff's 2017 grievance, (*id.* ¶ 150). Defendant has also given evidence that the hiring process for Job 4 placed a premium on, chiefly, CPS supervisory experience, along with expertise with the Child Welfare Assessment and Decision-Making ("CWADM") practice. (*Id.* ¶¶ 130, 133). Plaintiff contested the proposition that CWADM expertise was preferred, stating that "Ms. Manchester was offered the same position in New Orleans, which she did not apply for nor want due to travel, indicating that her qualifications, including her understanding of . . . [CWADM], were sufficient." (Plaintiff SOF ¶ 130). As support for this denial, Plaintiff cites to a nonexistent line

item on her own declaration. (*Id.*).

Plaintiff's denial is both nonresponsive and unsupported by competent summary judgment evidence. (*See id.*). Plaintiff is presumably referencing the Child Welfare Consultant role offered by Egan after Plaintiff was not selected for Job 3, which was a role that was within the OTJT program, and not the Centralized Decision-Making Unit ("CCDM"). (Defendant SOF ¶¶ 119, 124). The job duties of a Child Welfare Consultant in the OTJT program differ substantially from those in the CCDM Unit, and the job posting for Job 4 explicitly stated that the candidate must be a practice expert in CWADM. (*See id.* ¶¶ 105, 127-130, 142). Evans, the decision-maker for Job 4, reviewed Plaintiff's application and did not believe that her position with the CCWIS project would have required her to engage with CWADM. (*Id.* ¶ 143). Evans believed there was no other indication in Plaintiff's application materials that she was familiar with CWADM. (*Id.*). Plaintiff denies this offered fact "as argumentative" without further elaboration. (Plaintiff SOF ¶ 143). Plaintiff is required to rebut offered facts with competent summary judgment evidence. Since she has failed to do so, this offered fact is admitted.

Regardless, Evans, the hiring authority for Job 4, averred that the most important element for the position was CPS supervisory experience. (Defendant SOF ¶ 133). Plaintiff, at the time of her application, possessed approximately three years of CPS supervisory experience, with said experience ending in 2017. (*Id.* ¶¶ 136, 139). The three individuals hired—Patricia Stewart, Nancy Tucker, and Megan Stanley—possessed much greater and more recent CPS supervisory experience. (*Id.*

¶ 138). Stewart "had been working as a Child Welfare Consultant for approximately ten years, and was a Child Welfare Supervisor over CPS investigations for five years before that." (*Id.*). Tucker "had been a CPS Supervisor for more than 10 years at the time of her application." (*Id.*). Stanley "had been a CPS Supervisor for three and a half years at the time of her application and was currently working at the local level with the CCDM process." (*Id.*).

Given the qualifications sought, Evans concluded that, of the twenty-eight applicants for Job 4, Plaintiff was not among the most qualified. (*Id.* ¶ 144). Plaintiff was not selected to interview for the position. (*Id.* ¶ 135). There is nothing in the evidence submitted to the Court that indicates that this decision was motivated in any way by Plaintiff's sexual orientation. The Court therefore concludes that Plaintiff has failed to carry her evidentiary burden at summary judgment for her Job 4 claims, and such claims are subject to dismissal.

## III.  CONCLUSION

As the Court has addressed Jobs 1 through 4, and in each case found that Plaintiff has failed to establish a *prima facie* case of discrimination on the basis of sexual orientation, Plaintiff's claims shall be dismissed.

Accordingly,

**IT IS ORDERED** that Defendant's **Motion For Summary Judgment (Doc. 25)** be and is hereby **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiff's action be and is hereby **DISMISSED WITH PREJUDICE**.

Judgment shall issue separately.

Baton Rouge, Louisiana, this 13th day of November, 2024

JUDGE BRIAN A. JACKSON
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA